[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties intermarried on June 9, 1979 at Westport, Connecticut. The plaintiff has resided continuously in this state since that time. There are no minor children issue of this marriage.
The evidence presented at trial has clearly established the allegation that the marriage has irretrievably broken down. Judgment may enter dissolving the marriage on that ground.
The court has carefully considered the criteria set forth in 46b-81 and 46b-82 of the Connecticut General Statutes in reaching the decisions reflected in the orders that follow.
This is a marriage of approximately 10 years. It is the second marriage for both parties. Both parties are 53 years of age. At the time of the marriage in June 1979, the defendant was unemployed. Prior to that time the defendant, who is an accomplished pianist, was in the music industry and had achieved some medium success as a music director and orchestra leader in the Los Angeles area. The defendant had no assets coming into the marriage. He did have approximately $1,400 in liabilities which the plaintiff paid. The defendant was not gainfully employed earning any funds during the course of the marriage. He had no health problems during this time which would have prevented him from being gainfully employed.
The plaintiff at the time of the marriage, had inherited assets of approximately $600,000. The plaintiff also had a mortgage of approximately $350,000 in a building located at 167 Saw Mill River Road, Yonkers, New York. This mortgage generated $5,000 a month interest income which the parties lived on. During the course of the marriage the plaintiff received additional assets from the estate of her deceased father, and deceased son totaling approximately $325,000. The parties lived on the income from the plaintiff's assets and the capital during the course of their marriage. CT Page 4851
The defendant was not the conventional homemaker who remained at home to care for spouse, minor children and the home.
In 1981 the defendant conceived the idea for C.P.C., Creative Packaging Consultants, Ltd., a Connecticut Corporation. This corporation was created out of the fertile and imaginative mind of the defendant. The defendant was the Chairman of the Board and Chief Executive Officer. The corporation was to be the vehicle for a procession of projects and ideas created by the defendant. These projects ranged from aerospace to bean plants, from Costa Rico to North Dakota to Canada and from video to real estate. The defendant devoted himself to this corporation, spending his time reading, writing, traveling, researching, making contacts, and generating interest for his various projects. The defendant testified at length as to the time he put into this corporation and the various projects he worked on. Unfortunately, none of these projects, except one, generated any income. The Yonker's project generated approximately $30,000 in 1985. All of the funding and expenses for C.P.C. were paid for from the plaintiff's assets and from the rental income generated by the plaintiff's commercial building in Yonkers, the Loft. There was testimony that when the Loft was fully rented in 1985-1986, the rental income was approximately $220,000 per year. It is considerably less at this time.
C.P.C. had a lease with the plaintiff for a portion of the Loft building. That matter is the subject of litigation in New York. The plaintiff has resigned as an officer and director of the corporation and has also resigned as the attorney for the corporation.
The defendant was supportive of the plaintiff in her endeavors to complete law school. In addition, the defendant organized the bookkeeping for the Loft and took care of the collection of rents and payment of bills after the Loft was rented in 1986. The defendant is an avid letter writer and an excellent typist. He typed the business letters and many of the rental leases. Thus, the defendant was also able to use this rental income from the Loft to fund the many projects of C.P.C. and to pay for the corporation's expenses. Any bank loans that the corporation obtained were based on the plaintiff's financial balance sheet of assets. Any credit extended to the corporation was a direct result of the plaintiff's financial situation. All of the assets listed on the financial statement were the sole property of the plaintiff, owned by her prior to the marriage.
The defendant had the luxury during the 10 years of this CT Page 4852 marriage of being able to devote himself to his projects with a ready source of financial assistance close by — his wife's assets! Certainly, a windfall for the defendant. The defendant has educated himself at the expense of the plaintiff.
The plaintiff expended $42,000 from her funds to pay off the bank loan for the video equipment. The defendant testified the video equipment had a value of $150,000. The defendant is in control of the video equipment. The plaintiff also expended $6,000 for a piano for the defendant as well as a computer for the defendant's use. The plaintiff has become personally obligated on two bank loans — one of which is for a Bronco motor vehicle presently in the possession of the defendant. The defendant has a Lincoln motor vehicle in California. The commercial real estate located at 167 Saw Mill River Road, Yonkers, referred to as the Loft, was the subject of much testimony during the course of the trial. Prior to the marriage, the plaintiff invested approximately $350,000 in a mortgage loan secured by a mortgage in this building. The mortgage went sour in 1981 and the plaintiff purchased the property through foreclosure proceedings for $300.00. The building was in deplorable condition and the plaintiff expended over $300,000 in renovating this building in addition to paying back taxes of approximately $158,000. The plaintiff was assisted in this by her former husband, Mr. Neils Schwartz. The defendant did not contribute any funds toward this building and the expenses involved. All of the funds for the renovations and refurbishing came from the plaintiff's assets, plus $60,000 from her children's custodial funds. The parties stipulated and agreed that this building, the Loft, has a value of $1.3 million dollars. Thus, it was not necessary for the court to consider further, the necessity of an appraisal.
The plaintiff went along with the projects initiated by the defendant and continued the funding of C.P.C. through the rental income from her building, the Loft. The parties also used this income in addition to the interest and dividends generated by the plaintiff's assets, to maintain their life style.
In 1987, the plaintiff noticed a change of personality in the defendant. The plaintiff also discovered their account was overdrawn by $10,000. The defendant began to spend long periods of time in North Dakota in connection with another project. Apparently, word filtered back to the plaintiff about the defendant's blonde assistant and the plaintiff became convinced that the defendant was going to leave her for a younger woman. The plaintiff felt gross disloyalty on the defendant's part towards her and she concluded in March 1989 that her marriage had irretrievably broken down. The parties have lived apart CT Page 4853 since that time. The defendant filed a cross complaint also alleging that the marriage had broken down irretrievably.
Prior to the separation, the defendant filed a grievance against the plaintiff with the Connecticut Bar Association. The grievance was subsequently dismissed, no probable cause having been found.
During the past 10 years the defendant has had the luxury of being able to devote himself to his projects and to hold himself out as an entrepreneur, all solely through the benefit of the plaintiff's assets. The defendant has not earned any funds during this time. The plaintiff's funds, close to one million, the capital and income therefrom, have been used to fund CPC, the defendant and the family living expenses of the plaintiff and the defendant.
Four months after the parties separated and eight months after the plaintiff closed out the Loft account, the defendant was able to obtain three checks from this account and signed the plaintiff's name to the checks totaling approximately $12,000.
The plaintiff finally realized that she had been manipulated and in April 1989, she moved from their rented home and instituted this dissolution shortly thereafter.
No useful purpose would be served by reviewing all the evidence and testimony presented in this matter.
Sufficient evidence was presented for the court to conclude that the marriage had irretrievably broken down.
On the first two days of trial, the defendant was represented by counsel. Shortly after the conclusion of the defendant's testimony, the defendant terminated the service of his attorney. Although there was a hiatus of some 30 days before the trial resumed, (due to the defendant's illness), the defendant appeared pro se and actively participated in the trial to its conclusion.
The court declines to assess fault to either party for the breakdown of this marriage.
The court has carefully considered the criteria set forth in 46b-81 and 46b-82 of the Connecticut General Statutes in reaching the decisions reflected in the orders that follow.
The following orders shall enter:
1. By way of a lump sum settlement, the plaintiff shall CT Page 4854 pay to the defendant the sum of $80,000 payable one-half within 60 days and the balance within six months thereafter.
2. The plaintiff shall assign and transfer any and all interest and any and all stock she has in Creative Packaging Consultants, Ltd., to the defendant.
3. The plaintiff shall release and relinquish any and all claims she may have to any of the Video equipment now in the possession and/or control of the defendant.
4. The defendant shall produce and turn over the 1988 Bronco II motor vehicle now in his possession or control to the plaintiff. The plaintiff shall be solely responsible for the balance due on the existing note with Peoples Bank in connection with this motor vehicle.
5. The plaintiff shall be entitled to all the assets as reflected on her financial affidavit dated September 18, 1990 including the real estate located at 167 Saw Mill River Road, Yonkers, New York. The defendant shall not be entitled to any interest in this real estate.
6. The plaintiff is granted a change of name to Sandra Bendfeldt.
7. No alimony is awarded to either party.
8. The defendant shall be entitled to one-half of the 100 shares of the joint Prudential-Bache Securities account and one-half of the 106 shares of Welcome.
9. At the commencement of trial, counsel for the defendant made a request for attorney fees for services rendered up to that time on behalf of the defendant. The court took the request under advisement and indicated a determination would be made at the conclusion of the trial. Although the defendant terminated the services of his attorney after the defendant had testified, and proceeded pro se, the court assigned the question of attorney fees for a hearing on November 29, 1990. The defendant, pro se, was duly notified of this hearing, but failed to appear.
The defendant is awarded counsel fees in the amount of $3,000 as a contribution toward the fees of his attorney.
COPPETO, J.